**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

SALLY HOGAN,

                Plaintiff,

                v.

FIDELITY BROKERAGE SERVICES, LLC, *et al.*,

                Defendants.

Civil Action No. 22-6759 (MAS) (RLS)

**MEMORANDUM OPINION**

**SHIPP, District Judge**

    This matter comes before the Court upon Defendants Fidelity Brokerage Services LLC ("Fidelity"), Fidelity Personal and Workplace Advisors LLC, Gerasimos Melissaratos, and Jon Strohl's (collectively, "Defendants") Motion for Summary Judgment. (ECF No. 39.) Plaintiff Sally Hogan ("Plaintiff") opposed (ECF No. 41), and Defendants replied (ECF No. 44). The Court has carefully considered the parties' submissions and reaches its decision without oral argument under Federal Rule of Civil Procedure 78(b) and Local Civil Rule 78.1(b). For the reasons below, Defendants' Motion for Summary Judgment is granted in part and denied in part.

## I.    BACKGROUND

    The following facts are drawn from the Statement of Undisputed Material Facts ("SUMF") (SUMF, ECF No. 39-1), Response to the Statement of Undisputed Material Facts ("RSUMF")

(RUSMF, ECF No. 41-1 at 1-24), and Counterstatement of Material Facts ("CMF") (CMF, ECF No. 41-1 at 24-53), and are undisputed by the parties unless otherwise noted.[1]

### A.    Plaintiff's Employment at Fidelity and FMLA Leave

Plaintiff was hired by Fidelity as a financial consultant in June 2020, and worked at Fidelity's Princeton, New Jersey, investor center (the "Branch"), until she was terminated on October 1, 2022.[2] (SUMF ¶¶ 8, 91, 97.) During her employment, Plaintiff directly reported to two supervisors. (*Id.* ¶ 11.) From her start date until approximately March 2022, Plaintiff reported to Defendant Jon Strohl ("Strohl") who served as Vice President, Branch Leader. (*Id.*) From approximately March 2022 until her date of termination, she reported to Defendant Gerasimos Melissaratos ("Melissaratos") who served as Assistant Branch Manager. (*Id.* ¶ 11.)

On multiple occasions during her employment at Fidelity, Plaintiff requested leave to care for her daughter, who suffered from malnutrition, weight loss, and low heart rate due to an eating disorder, anorexia nervosa. (CMF ¶¶ 39-43.) As a result of her condition, Plaintiff's daughter was hospitalized several times, including in November 2020, May 2020 and summer of 2021. (CMF

---

[1] While Plaintiff submitted a Counterstatement of Material Facts with her opposition papers, Defendants failed to file a response to this Counterstatement. Thus, for the purposes of this motion, the material facts set forth in the Counterstatement are deemed undisputed. L. Civ. Rule 56.1(a) ("[t]he movant shall respond to any such supplemental statement of disputed material facts as above, with its reply papers" and "[e]ach statement of material facts shall be a separate document"); *V.C. ex rel. v. Target Corp.*, 454 F. Supp. 3d 415, 419 n. 3 (D.N.J. 2020) ("Local Civil Rule 56.1(a) deems a movant's statement of material facts undisputed where a party does not respond or file a counterstatement."); *see also Citadel Wellwood Urb. Renewal, LLC v. Borough of Merchantville*, No. 21-16700, 2023 WL 8184314, at *3 n.2 (D.N.J. Nov. 22, 2023), *aff'd*, No. 23-3239, 2024 WL 4200582 (3d Cir. Sept. 16, 2024) (deeming facts alleged in plaintiff's counterstatement as true given defendants' failure to submit a response); *Harley v. City of Woodbury*, No. 18-170, 2020 WL 1284433, at *1 n.1 (D.N.J. Mar. 18, 2020) (same).

[2] While Plaintiff's effective termination date was October 1, 2022, she was placed on administrative leave on September 27, 2022, and notified of her termination on September 28, 2022. (SUMF ¶¶ 91, 97; CMF ¶¶ 124-128.)

¶¶ 20, 39, 41, 42.) Plaintiff first requested leave to care for her daughter in October 2020. (SUMF ¶ 98.) Although she was not eligible for leave under the Family and Medical Leave Act ("FMLA") at that time, Fidelity approved her leave request under its own leave policies, which permits employees to take up to 12 weeks of time off in their first year of employment, as though they were eligible for leave under the FMLA. (*Id.* ¶ 99.) In her first year of employment, Plaintiff took a total of 29 hours of intermittent leave pursuant to these policies. (*Id.* ¶ 104.) Plaintiff became eligible for FMLA leave on June 29, 2021. (*Id.* ¶ 105.) Between August 20, 2021, and her date of termination, Plaintiff took 40 hours of intermittent leave, as well as approximately three months of consecutive FMLA leave from June 13, 2022 to September 2, 2022. (*Id.* ¶¶ 106, 108.)

### B.    Investigation of Plaintiff's TLO Activity and Subsequent Termination

Under certain circumstances, a financial consultant at Fidelity can temporarily "lock out" a customer in Fidelity's database, which results in the financial consultant receiving exclusive financial credit for the customer's deposits and transactions for 180 days. (SUMF ¶¶ 21, 22.) Because these temporary lockouts ("TLO") are conditioned on the financial consultant investing time and effort into the client, Fidelity requires a financial consultant have a "value-added conversation" with the client before entering a TLO and add notes regarding the conversation into Fidelity's customer relationship management system, Salesforce.[3] (*Id.* ¶¶ 3, 28, 30.) One of Melissaratos's responsibilities was to review TLOs taken by financial consultants on a weekly basis to ensure they contained notes in Salesforce to justify the TLO. (*Id.* ¶ 47.) Plaintiff was ultimately terminated following an internal investigation which concluded she had engaged in

---

[3] A financial consultant can complete a TLO of a client if either: (1) the client's account is over $500,000, a financial relationship was offered to the client, and the client declined it; or (2) the account is less than $500,000 and the client qualifies for a financial consultant's book of business, but the financial consultant had a value-added conversation with the client. (CMF ¶ 96, n.10.)

improper activity regarding TLOs. (*Id.* ¶¶ 46-85.) The Court briefly summarizes the events leading up to her termination.

In April 2022, two weeks after Plaintiff informed Melissaratos about an upcoming request for FMLA leave, Melissaratos told Plaintiff's colleague that he was "not sure about [Plaintiff's] commitment" and that she "[didn't] seem fully engaged." (CMF ¶ 76.) In May 2022, during an individual meeting with Plaintiff, Melissaratos told her that her use of FMLA leave was becoming a "chronic problem." (*Id.* ¶ 73.)[4] Around this time, he made additional comments to Plaintiff including:

> "[Y]ou're going out on leave again?"
>
> "[W]ell, how much time are you going to be out[?]"
>
> "[Y]ou're taking more FMLA leave[.]"
>
> "[Y]ou're using a lot of FMLA leave."

(*Id.* ¶ 74.)

Plaintiff states these comments made her feel "horrible, guilty, [and] frustrated," and discouraged her from taking leave. (*Id.* ¶ 75.) Plaintiff also experienced numerous administrative issues when attempting to request FMLA leave. (*Id.* ¶¶ 51, 52.) For example, Plaintiff requested FMLA leave prior to April 2022, but did not receive a response from the third-party administrator of FMLA leave, Sedgwick, until May 17, 2022. (*Id.* ¶ 52.) In that belated response, Sedgwick stated she needed to submit FMLA certification by May 12, 2022, five days prior to Plaintiff's receipt of the e-mail message. (*Id.* ¶ 53.) Plaintiff complained to Fidelity's Human Resources

---

[4] Melissaratos denied making this statement during his deposition. (*See* Defs.' Moving Br. Ex. 10 at 214:17-23, ECF No. 39-2.) However, as Defendants failed to dispute this fact as alleged in the Counterstatement, the Court assumes these facts as true for the purposes of this motion. (*See generally* CMF); *Citadel Wellwood Urb. Renewal, LLC*, 2023 WL 8184314, at *3 n.2.

Department regarding these issues, and Fidelity failed to resolve them. (*Id.*) Fidelity's Employee Relations Director, Ann Marie Rogers ("Rogers"), further testified to having received complaints from other employees regarding Sedgwick's handling of FMLA requests. (*Id.* ¶ 55.)

On May 10, 2022, Plaintiff informed Melissaratos that she needed to take additional intermittent FMLA leave because her daughter "[was] not doing well." (*Id.* ¶¶ 59, 78.) Melissaratos forwarded Strohl an e-mail message from Sedgwick regarding Plaintiff's leave request, to which Strohl responded, "Interesting." (*Id.* ¶ 80.) Plaintiff's leave request was ultimately approved, and Plaintiff was permitted to take intermittent FMLA leave until April 5, 2023. (*Id.* ¶ 62.)

The day after Plaintiff informed Melissaratos of her May leave request, on May 11, 2022, Melissaratos reached out to Fidelity's compensation unit and asked it to look into Plaintiff's use of temporary lock outs ("TLO") over the past 120 days. (*Id.* ¶ 79.) The compensation department reviewed Plaintiff's TLO activity and concluded her activity was not an "outlier." (*Id.* ¶ 91; *see* Pl.'s Opp'n Br. Ex. Y ("Ex. Y"), ECF No. 41-26.)

On June 2, 2022, Plaintiff informed Strohl and Melissaratos that she would again need to take additional FMLA leave because her "daughter had a setback that require[d] [she] take a leave of absence for a couple of weeks." (CMF ¶ 64.) On June 29, 2022, while Plaintiff was on leave, Melissaratos messaged Rogers on Microsoft Teams with a "question in terms of leave[s] of absence," and asked her whether there was a "maximum" or a "point to where [Fidelity] no longer need[ed] to guarantee [Plaintiff's] position." (Pl.'s Opp'n Br. Ex. W ("Ex. W"), ECF No. 41-24; CMF ¶ 82.) In the same conversation, Melissaratos added there was an issue "regarding a TLO as well." (Ex. W at 2.) Rogers offered to speak with him the next day. (Ex. W at 2; Pl.'s Opp'n Br. Ex. S ("Ex. S"), ECF No. 41-20.) In her meeting notes from June 30, 2022, Rogers wrote that Melissaratos told her Plaintiff's leave was "hurting the branch." (CMF ¶¶ 84-85; Ex. S; *see also*

Pl.'s Opp'n Br. Ex. L ("Ex. L") at 96:06-13, ECF No. 41-13 (testifying that she "recall[ed]" Melissaratos telling her "he thought [Plaintiff's] leave was hurting the branch").) She also noted that Melissaratos had expressed concern regarding Plaintiff's TLO activity, and Rogers discussed with him about possibly "checking in with . . . investigations" to see if this issue should be investigated further. (Ex. S at 2-3; CMF ¶ 86.)

Sometime between June 29, 2022 and July 18, 2022, while Plaintiff was on leave, a formal investigation was initiated into Plaintiff's TLO activity.[5] Fidelity assigned two investigators from its Internal Investigations Team to examine Plaintiff's TLO activity from March 1, 2022, to June 10, 2022. (SUMF ¶¶ 65, 66.) The investigators reviewed Plaintiff's Salesforce notes, phone records, Zoom logs, electronic communications, calendar, and customer account look up information. (Id. ¶ 67.)

Plaintiff, who was on leave at this time, extended her leave until September 6, 2022, to provide additional care for her daughter. (CMF ¶¶ 65-68.) During her leave, Plaintiff kept Strohl and Melissaratos informed of her daughter's condition, her requests for additional leave, and her expected return date. (Id. ¶¶ 69-70.)

Plaintiff returned to work on September 6, 2022. (SUMF ¶ 109.) On or about September 13, 2022, Melissaratos met with Plaintiff and "yelled at and berated" her, stating "you can't come back to work and not do anything," and repeating that Plaintiff's FMLA leave was a "chronic problem." (CMF ¶¶ 117-119.) During this meeting, Melissaratos did not mention any issue

---

[5] The parties dispute the exact date the investigation began, and at whose direction the investigation was initiated. While Defendants submit the investigation was initiated by Rogers on July 18, 2022, (SUMF ¶¶ 63, 64), Plaintiff asserts the investigation was initiated by Melissaratos on June 29, 2022, when he informed Rogers of the purported issue regarding Plaintiff's TLO activity, and later followed up with Rogers on July 15, 2022, to ensure Plaintiff would be investigated. (RSUMF ¶ 64.)

regarding Plaintiff's TLO activity, even though Fidelity was actively investigating this issue during this time. (*Id.* ¶ 120; *see* SUMF ¶¶ 64-85.) In fact, prior to September 27, 2022, Defendants never issued Plaintiff any verbal or written warnings regarding her TLOs. (CMF ¶ 167.)

On September 23, 2022, Plaintiff requested to take September 26, 2022 off as intermittent FMLA leave, and informed Strohl and Melissaratos of her request. (*Id.* ¶ 123.) On September 27, 2022, the investigators examining Plaintiff's TLO activity called Plaintiff to interview her. (SUMF ¶ 74.) This interview was the first time Defendants had spoken to Plaintiff about the investigation into her TLO activity. (CMF ¶¶ 112, 124.) During the call, Plaintiff denied wrongdoing, said she had been following her managers' directives regarding the TLO process, and informed the investigators of her belief that she was being "singled out." (CMF ¶¶ 125-127.) At the conclusion of the call, Plaintiff was placed on administrative leave. (CMF ¶ 128.) The next day, Defendants informed Plaintiff that she was being terminated for her purportedly improper TLO activity, with a termination date of October 1, 2022. (SUMF ¶¶ 97, 98.)

Defendants maintain that Plaintiff's termination was proper and due to her violations of their TLO policy. Specifically, they state that of the 70 TLOs Plaintiff had entered from March to June 2022, (*see* CMF ¶ 156), the investigators identified nine TLOS that "potentially" violate the TLO policy (SUMF ¶ 69). Of these nine TLOs, Defendants identified one TLO that was entered without Plaintiff, nor her planning consultant, having had any interaction with the customer. (SUMF ¶ 73). Plaintiff disputes these conclusions and further denies having ever violated the TLO policy. (RSUMF ¶¶ 69-73, 75-78, 80, 82-85, 89.)

### C.    The Form U5

As a broker dealer, Fidelity has a duty to submit a Form U5 to the Financial Industry Regulatory Authority ("FINRA") when terminating an individual's registrations with the company. (SUMF ¶ 93.) On the Form U5, Fidelity provided the reason for Plaintiff's termination as "Discharged." (*Id.* ¶ 94.) Fidelity also provided the following explanation for Plaintiff's termination:

> Concerns that employee recorded credit for customer interactions, which can impact compensation, without having had the required interaction with the customers to earn such credit. Discharge did not result from a customer complaint or from any sales practice violation or concern.

(*Id.* ¶ 95.)

Fidelity also answered "Yes" to Question 7F(1) on the Form U5, which asks:

> Did the individual voluntarily resign from your firm, or was the individual discharged or permitted to resign from your firm, after allegations were made that accused the individual of (1) violating investment-related statutes, regulations, rules or industry standards of conduct?

(*Id.* ¶¶ 95-96.)

Fidelity also stated on the required Disclosure Reporting Page that the "Termination Type" was "Discharged" and that the allegation made was:

> That employee recorded credit for customer interactions, which can impact compensation, without having had the required interaction with the customers to earn such credit. Discharge did not result from a customer complaint or from any sales practice violation or concern.

(*Id.* ¶ 97.)

Plaintiff alleges that these statements are false and defamatory. (CMF ¶ 175.) Since Plaintiff's termination, Plaintiff has applied for many financial services positions but has not received any due to the language on her Form U5. (*Id.* ¶ 178.) In addition, at least two job offers

Plaintiff received following her termination, including from Charles Schwab and TIAA, were rescinded because of the statements made on her Form U5. (*Id.* ¶ 176.)

### D.    Procedural Background

Plaintiff brings interference and retaliation claims under the FMLA and the New Jersey Family Leave Act ("NJFLA"), discrimination claims under the Americans with Disabilities Act ("ADA") and the New Jersey Law Against Discrimination ("NJLAD"), and a defamation claim under New Jersey law. (ECF No. 9.) Following the close of fact discovery on June 21, 2024, Defendants filed the instant motion seeking summary judgment in their favor on all of Plaintiff's claims. (*See generally* Defs.' Moving Br., ECF No. 39.) The parties having briefed the issues thoroughly, Defendants' Motion for Summary Judgment is now ripe for resolution.

## II.    <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 56(a) provides that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a summary judgment motion, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine dispute of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

9

Once the moving party has met that threshold burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine dispute as to a material fact for trial. *Anderson*, 477 U.S. at 247-48; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which the nonmoving party must rely to support its assertion that genuine disputes of material fact exist). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial[,] . . . 'there can be no genuine [dispute] of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 n.5 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322-23).

In deciding a summary judgment motion, the Court's role is not to evaluate the evidence and decide the truth of the matter but to determine whether there is a genuine dispute for trial. *Anderson*, 477 U.S. at 249-250. Credibility determinations are the province of the fact finder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992). The summary judgment standard, however, does not operate in a vacuum. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson*, 477 U.S. at 254.

## III.  DISCUSSION

Defendants move for summary judgment on all of Plaintiff's claims. (*See generally* Defs.' Moving Br.) The Court considers each of Plaintiff's claims in turn.

**A.    Plaintiff's Retaliation Claims Under the FMLA/NJFLA**

As a threshold matter, because the parties agree that the same legal standards and analysis apply to claims brought under the FMLA and NJFLA, all references by the Court to the FMLA apply equally to the NJFLA, and the Court's holdings as to Plaintiff's FMLA claims apply equally to the NJFLA claims. (Defs.' Moving Br. 17, ECF No. 39; Pls.' Opp'n Br. 5, ECF No. 41); *see Wolpert v. Abbott Labs.*, 817 F. Supp. 2d 424, 437 (D.N.J. 2011) ("Due to the similarity of the statutes, courts apply the same standards and framework to claims under the FMLA and the NJFLA."); *Santosuosso v. NovaCare Rehab.*, 462 F. Supp. 2d 590, 596 (D.N.J. 2006) (same).

To prevail on a retaliation claim under the FMLA, a plaintiff must prove that (1) she invoked her right to FMLA-qualifying leave; (2) she suffered an adverse employment decision; and (3) the adverse action was causally related to her invocation of rights. *See Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 508-09 (3d Cir. 2009). Because FMLA retaliation claims require proof of the employer's retaliatory intent, courts have assessed these claims through the lens of employment discrimination law. *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 302 (3d Cir. 2012). Accordingly, FMLA retaliation claims based on circumstantial evidence have been assessed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), while claims based on direct evidence have been assessed under the mixed-motive framework set forth in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 276-77 (1989) (O'Connor, J., concurring). *See Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 147 (3d Cir. 2004). A plaintiff faces a "much more onerous burden" under the *McDonnell Douglas* framework than under *Price Waterhouse*. *Beese v. Meridian Health Sys. Inc.*, No. 11-7505, 2014 WL 3519124, at *4 (D.N.J. July 16, 2014), *aff'd*, 629 F. App'x 218 (3d Cir. 2015).

While Plaintiff urges the Court to apply the mixed-motive framework of *Price Waterhouse* on the grounds that Melissaratos's disparaging comments constitutes "direct evidence" of retaliation, (Pl.'s Opp'n Br. 10-12), the Court need not reach this question because Plaintiff's retaliation claim readily survives summary judgment under the more onerous *McDonnell Douglas* standard. *See Lichtenstein*, 691 F.3d at 302 (holding that whether the case could proceed under a mixed-motive instruction was irrelevant because the case could proceed under "the more taxing *McDonnell Douglas* standard"). Accordingly, this Court proceeds by analyzing Plaintiff's FMLA retaliation claim under the burden-shifting framework of *McDonnell Douglas*.

Under the *McDonnell Douglas* standard, Plaintiff has the initial burden of establishing a prima facie case. To do so, she must point to evidence in the record sufficient to create a genuine factual dispute about each of the three elements of her retaliation claim—*i.e.*, (1) invocation of an FMLA right; (2) termination; and (3) causation. *Id.* at 302. Once Plaintiff has established this prima facie case, the burden of production shifts to Fidelity, the employer, to "articulate some legitimate, nondiscriminatory reason" for its decision. *McDonnell Douglas Corp.*, 411 U.S. at 802. If Fidelity meets this minimal burden, Plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably . . . disbelieve [Fidelity's] articulated legitimate reasons." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

After consideration, the Court concludes that Plaintiff has adduced sufficient facts to make out a prima facie retaliation claim. It is undisputed that Plaintiff meets the first two elements of a prima facie claim, as Plaintiff took FMLA leave and was eventually terminated. (SUMF ¶¶ 97, 98, 106, 108.) With respect to the third prong of causation, it is undisputed that Plaintiff was informed of her termination on September 28, 2022, five days after requesting intermittent FMLA leave on September 23, 2022, and twenty-one days after returning from a consecutive FMLA leave on

September 6, 2022. (CMF ¶¶ 131-132.) It is well settled that "[w]hen the 'temporal proximity' between the protected activity and adverse action is 'unduly suggestive,' this 'is sufficient standing alone to create an inference of causality and defeat summary judgment.'" *Lichtenstein*, 691 F.3d at 307 (quoting *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007)). Here, the short duration between Plaintiff's leaves of absence and termination can provide an evidentiary basis from which an inference of retaliation can be drawn. *See Fasold v. Just.*, 409 F.3d 178, 190 (3d Cir. 2005) (finding that a period of "less than three months" between employee's protected activity and termination constituted temporal proximity and was sufficient to defeat defendant's motion for summary judgment).

The Court need not rely on temporal proximity alone because Plaintiff has also presented sufficient circumstantial evidence from which a reasonable factfinder could infer a causal connection between Plaintiff's leaves of absence and her termination. *See Woodson v. Scott Paper Co.*, 109 F.3d 913, 920-21 (3d Cir. 1997) ("[A] plaintiff can [also] establish a link between his or her protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period."); *White v. Sch. Dist. of Phila.*, No. 05-92, 2008 WL 2502137, at *7 (E.D. Pa. June 19, 2008), *aff'd*, 326 F. App'x 102 (3d Cir. 2009) ("The main factors in determining a causal link between a protected activity and an adverse employment action are timing and a pattern of antagonism between the two.").

In the months preceding her termination, Melissaratos made disparaging comments about Plaintiff's leave, including calling it a "chronic problem," stating she was "using a lot of FMLA leave," and questioning how long her leave would be. (CMF ¶¶ 73, 74.) In addition, Melissaratos made both requests that Defendants look into Plaintiff's TLO activity shortly after Plaintiff had informed him of her need to take leave. (*Id.* ¶ 91; Ex. Y.) When Melissaratos raised Plaintiff's

13

TLO activity as an issue for the second time on June 30, 2022, he simultaneously expressed frustration with Plaintiff's leave, stating her leave was "hurting the branch" and asking Rogers if there was a "maximum" regarding leaves of absence, or a "point to where [Fidelity] no longer need[ed] to guarantee [Plaintiff's] position." (Ex. W; *see* Ex. L at 96:06-13; CMF ¶ 82.) A factfinder could thus find a causal link from the pattern of antagonism established in the record, especially considering these antagonisms occurred at the same time Defendants chose to investigate Plaintiff's purported misconduct. *See Alred v. Eli Lilly & Co.*, 771 F. Supp. 2d 356, 371 (D. Del. 2011) (denying summary judgment on retaliation claim and holding that an inference of causation may be drawn from the "series of antagonisms" in the record).

Fidelity has set forth a legitimate and nondiscriminatory reason for Plaintiff's termination—her purportedly improper TLO activity. (Def.'s Moving Br. 23); *McDonnell Douglas Corp. v. Green*, 411 U.S. at 802. The burden then shifts to Plaintiff, who must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably . . . disbelieve [Fidelity's] articulated legitimate reasons." *Fuentes*, 32 F.3d at 764.

Here, Plaintiff has adduced sufficient evidence of pretext to rebut Fidelity's legitimate explanation for her termination. While Defendants insist Plaintiff violated the TLO policy between March and June 2022 (Defs.' Moving Br. 12), Defendants had conducted an initial review in May 2022, analyzing Plaintiff's TLO activity over the preceding four months, and had concluded her activity was not an "outlier." (Ex. Y.) Nonetheless, one month later, Melissaratos again asked to investigate Plaintiff's TLO activity over the preceding four months. (Ex. W; Ex. S; CMF ¶ 82; SUMF ¶¶ 65, 66.) While this later investigation concluded Plaintiff violated the TLO policy, Defendants offer no explanation for the contradictory results reached by these two independent reviews. (*See* CMF ¶ 91; Ex. Y.) Further, Plaintiff received satisfactory job ratings throughout her

employment at Fidelity, (CMF ¶¶ 18-25), and Melissaratos never raised Plaintiff's TLO activity as an issue between March and June 2022 when the purported TLO violations occurred, despite having reviewed TLOs on a weekly basis, and having had individual meetings with Plaintiff to discuss her performance. (CMF ¶¶ 104, 105, 110, 111.) It is also undisputed that while Plaintiff was immediately terminated for purportedly improper TLO activity without prior disciplinary warnings or corrective action, Melissaratos did not discipline or report other financial consultants who failed to insert adequate notes for their TLOs, and instead afforded them corrective action. (CMF ¶¶ 110-114); *see Bello v. Spring Creek Rehab. & Health Care Ctr.*, No. 11-1268, 2012 WL 12893871, at *4 (M.D. Pa. June 28, 2012) (holding evidence of similarly situated employees who were not terminated for the same conduct was adequate to establish a reasonable inference of pretext for FMLA retaliation claim), *R. & R. adopted sub nom.*, No. 11-1268, 2012 WL 12903153 (M.D. Pa. July 24, 2012).

Plaintiff has thus pointed to sufficient evidence from which a factfinder could disbelieve Defendants' articulated reason for Plaintiff's termination.[6] *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 289 (3d Cir. 2001) (denying summary judgment on FMLA retaliation claim because plaintiff demonstrated defendant's proffered reasons for his termination were

---

[6] Defendants further argue that it is "undisputed that independent investigators with no knowledge of the reason for Plaintiff's leave or her leave history established incontrovertibly that Plaintiff had violated the TLO policy" and "other employees [at Fidelity] have taken leaves of absence under the FMLA and/or NJFLA . . . and remained employed without issue." (Defs.' Moving Br. 25, 29.) These arguments are unavailing. Contrary to Defendants' assertions, Plaintiff disputes that the investigators were independent and had no knowledge of Plaintiff's leave during their investigation. (RUSMF ¶ 68.) Further, while it may be true that other employees have taken FMLA leave and not suffered an adverse employment action, the undisputed record establishes that other financial consultants who committed a similar infraction to Plaintiff—*i.e.*, failing to insert adequate notes for their TLOs—were not disciplined or reported. (CMF ¶¶ 110-114); *Miller v. Aramark Healthcare Support Servs.*, 555 F. Supp. 2d 463, 471 (D. Del. 2008) (denying summary judgment on FMLA retaliation claim in part because "other [employees in plaintiff's role] were not disciplined for similar infractions").

"inconsistent," and "coupled with the ongoing antagonism in the record," the record contained "ample proof" from which a factfinder could find retaliation) (internal quotation marks omitted)). Accordingly, summary judgment on Plaintiff's FMLA retaliation claim is denied.

**B.    Plaintiff's Interference Claims Under the FMLA/NJFLA**

In addition to retaliation, Plaintiff alleges Fidelity interfered with her rights under the FMLA by: (1) discouraging her from taking FMLA leave; and (2) terminating her before she could take additional leave that she was approved to take until April 5, 2023. (CMF ¶ 62.) To prevail on an FMLA interference claim, Plaintiff must establish: "(1) [she] was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) [she] was entitled to FMLA leave; (4) [she] gave notice to the defendant of [] her intention to take FMLA leave; and (5) [she] was denied benefits to which . . . she was entitled under the FMLA." *Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 155 (3d Cir. 2017) (emphasis added) (quoting *Ross v. Gilhuly*, 755 F.d 185, 191-92 (3d Cir. 2014)).

Defendants argue that Plaintiff's FMLA interference claim fails as a matter of law because Fidelity never denied Plaintiff's requests for FMLA leave and thus Plaintiff was never "denied" a benefit to which she was entitled. (Defs.' Moving Br. 17-20.)

It is undisputed that Plaintiff was always granted leave when she requested it during her employment at Fidelity. (SUMF ¶ 111.) However, interference with the exercise of an employee's FMLA rights includes not only refusing to authorize FMLA leave, but also "*discouraging* an employee from using such leave." *Majewski v. Fischi*, 372 F. App'x 300, 305 (3d Cir. 2010) (emphasis added) (quoting 29 C.F.R. § 825.220(b) (2009)); *see also DiIorio v. Neshaminy Manor*, 319 F. App'x 115, 117 (3d Cir. 2009) ("The FMLA prohibits an employer from interfering with, restraining or denying an employee his rights under the FMLA.") (citing 29 U.S.C. § 2615(a)(1)).

To show an employer discouraged an employee from taking FMLA leave, employees must show that the employer took some affirmative step, such as pressuring them to take leave at another time, *see Williams v. Shenango, Inc.*, 986 F. Supp. 309, 320-321 (W.D. Pa. 1997), criticizing them for taking too much FMLA leave, *see Grosso v. Fed. Express Corp.*, 467 F. Supp. 2d 449, 464 (E.D. Pa. 2006), or proposing they work from home instead of taking FMLA leave, *see Butler v. IntraCare Hosp. N.*, No. H-05-2854, 2006 WL 2868942, at *4 (S.D. Tex. Oct. 4, 2006); *Hilborn v. Cordaro*, No. 06-0223, 2007 WL 2903453, at *7 (M.D. Pa. Sept. 28, 2007) (summarizing cases where courts found viable FMLA interference claims based on the theory that an employer "discourage[d]" an employee from taking leave).

The Court concludes a reasonable factfinder could find Defendants interfered with Plaintiff's rights by "chilling" Plaintiff's desire to take FMLA leave, or by preventing her from taking future leave that she was approved to take. *Erdman*, 582 F.3d at 509 (preemptively firing an employee before she commences leave "may constitute interference with the employee's FMLA rights as well as retaliation); *Kimes v. Univ. of Scranton*, 126 F. Supp. 3d 477, 501 (M.D. Pa. 2015) (internal quotation marks omitted) (quoting *Grosso*, 467 F. Supp. 2d. at 463) ("[A] plaintiff may have an actionable FMLA interference claim where the employer takes any action that could chill desire to take FMLA leave, even when the employee takes the leave.").

Here, it is undisputed that Plaintiff was approved to take leave until April 5, 2023, but was terminated in 2022 before she could exhaust this approved leave. (CMF ¶¶ 62, 131; SUMF ¶ 91.) In addition, Plaintiff's immediate supervisor, Melissaratos, made disparaging comments to her regarding her leave on multiple occasions, including calling her leave a "chronic problem" twice, and stating she was "using a lot of FMLA leave." (CMF ¶¶ 73, 74, 119.) As a result of these comments, Plaintiff felt "horrible, guilty, frustrated," and discouraged from taking leave. (*Id.* ¶ 75.)

17

Plaintiff also faced multiple administrative hurdles when requesting leave, which were not resolved despite Plaintiff reporting these issues to the Human Resources department. (*Id.* ¶¶ 51-55.)

Defendants rely on *Fraternal Order of Police v. City of Camden*, 842 F.3d 231 (3d Cir. 2016), to argue that a supervisor's disparaging comments are insufficient evidence to establish an interference claim. (Defs.' Reply Br. 3-4, ECF No. 44.) Defendants' reliance on this authority is misplaced. The plaintiff in *Fraternal Order of Police* was not terminated from his employment, but rather based his interference claim solely on a few "insensitive . . . reprimands" from supervisors regarding his leave requests. 842 F.3d at 245-46. The Court found that the few reprimands he suffered were "on their own" insufficient to support relief under the FMLA because these actions did not "occur in tandem with actual harm." *Id.* at 246. Here, however, Plaintiff was harmed as she was terminated from her employment prior to exhausting her approved leave, and the record also establishes multiple reprimands and administrative hurdles that discouraged Plaintiff from taking further leave. (*See* CMF ¶¶ 51-55, 73-75, 119.) Taken together, these comments and actions establish sufficient injury and create a dispute of material fact as to whether Defendants' actions unlawfully interfered with Plaintiff's FMLA rights.[7] *See Grosso*, 467 F. Supp. 2d at 464 (denying defendant's motion for summary judgment on FMLA interference claim where plaintiff's employer told him he was taking too much leave and employee was subsequently

---

[7] *Capps*, *Shedden*, and *Ross* which Defendants cite, each differ from the instant case. The plaintiffs in these cases did not allege they were discouraged from taking FMLA leave; instead, they only claimed that their FMLA rights were impeded by virtue of their termination. *See Capp*, 847 F.3d at 155-156; *Shedden v. Port Auth. of N.Y. & N.J.*, No. 20-17063, 2024 WL 278568, at *4 (D.N.J. Jan. 25, 2024); *Ross*, 755 F.3d at 192 n.11 (3d Cir. 2014) (holding plaintiff waived the argument that he was "discouraged" from taking FMLA leave because he did not raise this argument in his opening brief, and in any event, this argument was unsupported by the record).

terminated); *Shtab v. Greate Bay Hotel & Casino, Inc.*, 173 F. Supp. 2d 255, 268 (D.N.J. 2001) (finding employer's request that plaintiff delay FMLA leave until after busy holiday weekend sufficient to permit reasonable person to conclude that employee's rights under FMLA were chilled).[8] Accordingly, Defendants' Motion for Summary Judgment on Plaintiff's interference claims is denied.

### C.    Plaintiff's Disability Discrimination and Retaliation Claims Under the ADA/NJLAD

The Court turns next to Defendants' motion for summary judgment on Plaintiff's disability discrimination claims.[9] Defendants argue under the *McDonnell Douglas* framework, Plaintiff cannot establish a prima facie case of discrimination, and that even if she could, she cannot establish pretext to rebut Fidelity's legitimate, non-discriminatory reason for Plaintiff's termination. (Defs.' Moving Br. 31-33.)

The ADA contains an "association provision" that prohibits "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." *Erdman*, 582 F.3d at 510 (quoting 42 U.S.C. § 12112(b)(4)). While the Third Circuit has not

---

[8] Defendants also argue that Plaintiff's interference claim fails as a matter of law because "the undisputed record establishes that Fidelity terminated Plaintiff's employment for legitimate reasons unrelated to her FMLA leave." (Defs.' Moving Br. 19-20.) Given the Court's conclusion that a reasonable factfinder could find Defendants unlawfully terminated Plaintiff in retaliation for taking FMLA leave, this argument fails.

[9] While Defendants generally submit that Plaintiff's complaint be dismissed "in its entirety," (Defs.' Moving Br. 40), Defendants only address Counts I-IV of Plaintiff's Amended Complaint in their moving papers and fail to discuss Count V (discrimination under the ADA) (*see id.*). Because courts assess discrimination claims under the NJLAD and ADA using the same legal standards and frameworks, *see Tucker v. Concrete*, No. 22-1026, 2024 WL 1485992, at *12 (D.N.J. Apr. 5, 2024), and Count III and Count V are premised on the same facts and allegations, the Court applies Defendants' arguments regarding Plaintiff's NJLAD claim to Plaintiff's ADA claim, and considers these claims and arguments together.

enunciated its own prima facie test for associational discrimination, it has persuasively cited the following standard:

> (1) the plaintiff was "qualified" for the job at the time of the adverse employment action; (2) the plaintiff was subjected to adverse employment action; (3) the plaintiff was known by his employer at the time to have a relative or associate with a disability; [and] (4) the adverse employment action occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision.

*Dodson v. Coatesville Hosp. Corp.*, 773 F. App'x 78, 83 (3d Cir. 2019) (non-precedential).

Defendants move for summary judgment as to Plaintiff's ability to prove the first and fourth elements of her prima facie case. (Defs.' Moving Br. 31-33.) The Court agrees with Defendants that Plaintiff cannot establish the fourth element of her prima facie case.[10]

Courts have determined that, to satisfy the fourth element of an associational discrimination claim, a plaintiff must demonstrate that the adverse employment decision was based on "unfounded stereotypes and assumptions arising from the employee['s] relationship[]" with a disabled individual. *Tyson v. Access Servs.*, 158 F. Supp. 3d 309, 314 (E.D. Pa. 2016). Importantly, the Court must consider whether Plaintiff has produced sufficient evidence from which a reasonable jury could adduce that Defendants terminated Plaintiff "*because* of her daughter['s] . . . disability." *Erdman*, 582 F.3d at 510. In other words, the ADA's association provision makes a "material distinction between firing an employee because of a relative's disability and firing an employee because of the need to take time off to care for the relative." *Id.* As such, Plaintiff must show that Defendants terminated her based on her daughter's disability as opposed to her absenteeism and inability to attend work. *Id.*

---

[10] Because the Court finds that Plaintiff cannot prevail on the fourth element of a prima facie associational disability claim, the Court need not reach whether Plaintiff can prevail on the first element of a prima facie associational disability claim.

The record presented here is devoid of evidence suggesting that Defendants' decision to terminate Plaintiff was motivated by her daughter's disability or "unfounded stereotypes." *Tyson*, 158 F. Supp. at 314. Defendants knew about Plaintiff's daughter's disability for at least two years before Plaintiff was fired. (CMF ¶ 44.) From October 2020 through September 2022, Plaintiff was approved for and took various leaves without any adverse action from Defendants. (CMF ¶¶ 44-49, 59-70); *see Erdman*, 582 F.3d at 511 (denying ADA associational discrimination claim where the record established that the defendant "was aware of [plaintiff's daughter's] disability for many years before [plaintiff] was fired").

Plaintiff contends that Defendants' comments, including Melissaratos's comment about Plaintiff not being "fully engaged" and calling her leave a "chronic problem," give rise to an inference of associational disability discrimination. (Pl.'s Opp'n Br. 35.) These comments, without more, cannot sustain an associational disability claim. Here, as in *Erdman*, "[t]he most [Plaintiff] can hope to show is that [she] was fired for requesting time off to care for [her daughter] (on the basis of [her] FMLA claim), not because of unfounded stereotypes or assumptions on [Defendants'] part about care required by disabled persons." *Erdman*, 582 F.3d at 511.

Thus, although Plaintiff may be able to sustain an FMLA claim that Defendants fired her for requesting time off to care for her daughter, she cannot sustain an associational discrimination claim, which requires a finding that Defendants fired her because of unfounded stereotypes or assumptions Defendants had about the care disabled persons require. *Beird v. Lincoln Univ*, 487 F. Supp. 3d 270, 282 (E.D. Pa. 2020) ("[I]f [d]efendant was singling [p]laintiff out for her time off, rather than for her or her family members' disabilities, the proper claim is one for FMLA retaliation, not associational disability discrimination"); *Tucker*, 2024 WL 1485992, at *11-12 (granting summary judgment in favor of defendant on plaintiff's associational disability

discrimination claims because the evidence, at most, could only show plaintiff was fired for absenteeism, not because of unfounded stereotypes or assumptions about the care required by plaintiff's disabled son). Accordingly, the Court grants summary judgment in favor of Defendants as to Plaintiff's associational discrimination claims.

### D.     Defamation

Defendants argue that Plaintiff's defamation claim fails as a matter of law because: (1) the content on Plaintiff's FINRA Form U5 is truthful; and (2) regardless of the truth of the content, Plaintiff cannot assert a viable defamation claim because content on a Form U5 is afforded an absolute or qualified privilege. (*See* Defs.' Moving Br. 34-40.)

Defendants' first contention—that the content on the Form U5 is truthful—readily fails. Assuming the facts alleged in the Counterstatement as true, Plaintiff "did not violate any investment-regulated statutes, regulations, rules or industry standards of conduct," and her Form U5 falsely states that she did. (CMF ¶¶ 174-75; *see also* RSUMF ¶¶ 89, 93-97.)

Defendants next argue that Plaintiff's defamation claim fails as a matter of law because statements made on a Form U5 are afforded either a conditional or absolute privilege. (Defs.' Moving Br. 39.) An absolute privilege wholly immunizes the publisher from liability and arises in the "narrow context of statements made in the course of judicial, administrative, or legislative proceedings." *Kadetsky v. Egg Harbor Twp. Bd. of Educ.*, 82 F. Supp. 2d 327, 344 (D.N.J. 2000). A conditional, or qualified, privilege applies to a broader range of situations, specifically when a "statement is made for a common interest shared between the publisher and the recipient." *Id.*

While the Third Circuit has declined to directly resolve "whether conditional or absolute privilege applies to statements made on a Form U5," it has endorsed at least applying a conditional

privilege to such statements when evaluating a party's arguments at summary judgment.[11] *Preston v. Fid. Brokerage Servs.*, No. 20-1612, 2022 WL 964001, at *3-4 (3d Cir. Mar. 30, 2022) (affirming district court's application of conditional privilege to statements made on a Form U5 but otherwise declining to address whether conditional or absolute privilege applies to a Form U5). The Court follows the approach in *Preston* to apply "the most plaintiff-friendly standard in evaluating the parties' summary judgment arguments" and assumes a conditional privilege to content on a Form U5. *Preston*, 2022 WL 964001, at *3.[12]

Under New Jersey law, communications that are protected by a conditional privilege are not actionable unless Plaintiff can demonstrate that Defendants "abuse[d] the privilege." *Afiriyie v. Bank of Am., N.A.*, No. A-1595-10T2, 2013 WL 451895, at *11 (N.J. Super. Ct. App. Div. Feb. 7, 2013). "Abuse of privilege" can be demonstrated by showing the statement was made for "some improper motive," or if the speaker "knew the statement to be false or acted in reckless disregard of its truth or falsity." *Afiriyie*, 2013 WL 451895, at *11 (citing *Feggans v. Billington*, 677 A.2d 771, 777 (App. Div. 1996); *see also Restatement (Second) of Torts* §§ 599-600, 603-05 (1977).

---

[11] In declining to resolve whether qualified or absolute privilege applies to statements made on a Form U5, the Third Circuit noted that "[o]nly four states have provided absolute privilege to form U5 defamation: California, Colorado, Massachusetts, and New York." *Preston*, 2022 WL 964001, at *3 n.5.

[12] In Plaintiff's Amended Complaint, Plaintiff admits that content on a Form U5 should be afforded a "condition[al] privilege" because employers submit this form pursuant to a "legal requirement and public interest." (Am. Compl. ¶ 67, ECF No. 9.) In Plaintiff's opposition brief, however, Plaintiff asserts for the first time that content on a Form U5 should not be subject to any privilege. (Pl.'s Opp'n Br. 37.) "It is well-settled that [a] plaintiff may not amend [the] complaint through arguments in [a] brief." *Cheeseman v. Baxter Healthcare Corp.*, No. 08-4814, 2009 WL 1351676, at *4 (D.N.J. May 13, 2009) (quoting *Frohner v. City of Wildwood,* No. 07-1174, 2008 WL 5102460, at *9 (D.N.J. Dec.1, 2008)). The Court thus relies on Plaintiff's representations in its Amended Complaint and disregards Plaintiff's contention that statements made on a Form U5 should not be subject to any privilege.

Especially where credibility is an issue, "the question of whether the [conditional] privilege was abused is normally a jury question." *Afiriyie*, 2013 WL 451895, at *11.

In this case, the Court finds sufficient evidence exists from which a reasonable factfinder could conclude that Defendants made the statements on Plaintiff's Form U5 for "some improper motive" or "knew the statement to be false or acted in reckless disregard of its truth or falsity." *Afiriyie*, 2013 WL 451895, at *11. It is undisputed that Melissaratos—who made disparaging comments to Plaintiff regarding her leave—was involved in publishing the content on Plaintiff's Form U5, and specifically "reviewed and approved [the] language." (CMF ¶ 174.) It is further undisputed that prior to the second investigation into Plaintiff's TLO activity, Defendants had conducted a recent and prior review and determined Plaintiff was not an "outlier" in terms of TLO activity. (CMF ¶ 91; Ex. Y.) Nonetheless, Defendants present no evidence to suggest they attempted to reconcile these contradictory results or discuss with Plaintiff their concerns regarding her TLO activity until the day she was placed on administrative leave. (CMF ¶¶ 124, 129-130.) When the investigators finally approached Plaintiff to discuss this issue on September 27, 2022, she denied all wrongdoing and expressed concerns of being improperly "singled out." (CMF ¶¶ 125-127.) At the conclusion of the call and without further investigation, however, Plaintiff was placed on administrative leave and notified of her termination the next day. (CMF ¶¶ 128, 131.)

The Court finds Plaintiff has made sufficient allegations to overcome the conditional privilege at summary judgment. *Afiriyie*, 2013 WL 451895, at *11 (applying conditional privilege and denying summary judgment on defamation claim where two witnesses testified the publisher of the statement had knowledge the statement was false, and while the publisher denied these allegations, the evidence "supported a conclusion that . . . [defendant] acted with reckless disregard as to the truth or falsity of her statement"); *Lutz*, 586 A.2d at 289 (applying conditional privilege

and denying summary judgment on defamation claim because the court could not conclude as a matter of law that the publisher's statement was "an accurate portrayal" and the "question of [the publisher's] credibility" was appropriately left for a jury to decide); *see also Galarneau v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 504 F.3d 189, 202 (1st Cir. 2007) (affirming jury verdict of defamation concerning false statements made on a Form U5 where conditional privilege applied and employer made the false statement with either knowledge of the falsity or recklessly disregarded its falsity). Accordingly, summary judgment as to Plaintiff's defamation claim is denied.

## IV.    **CONCLUSION**

Viewing the facts in the light most favorable to Plaintiff and drawing all reasonable inferences in her favor, the Court finds that there are genuine disputes of material fact as to Plaintiff's interference and retaliation claim under the FMLA (Count I), interference and retaliation claim under the NJFLA (Count II), and defamation claim (Count IV). The Court finds that no genuine dispute of material fact exists as to Plaintiff's discrimination claims under the NJLAD (Count III) and ADA (Count V). For the foregoing reasons, Defendants' Motion for Summary Judgment is granted in part and denied in part. The Court will issue an order consistent with this Memorandum Opinion.

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE